```
                                  UNITED STATES DISTRICT COURT
                                  SOUTHERN DISTRICT OF FLORIDA

                                  CASE NO. 08-22481-CIV-SEITZ
                                  MAGISTRATE JUDGE P.A. WHITE
```

TODD CARLTON SMITH,              :

     Plaintiff,             :        <u>REPORT OF</u>
                                          <u>MAGISTRATE JUDGE</u>
v.                               :

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,       :

     Defendant.             :
_____

## I. Introduction

Plaintiff Todd Carlton Smith is currently housed in the El Dorado Correctional Facility in Kansas. Smith was originally incarcerated with the Florida Department of Corrections ("FDOC") in 1991 for threatening a State Attorney, a crime for which he received a twelve-year sentence. (DE# 24, p. 1). Smith is a known member of the Gay Lord Disciples ("GLD"), a gang under the umbrella of the Folk Nation gang, which is a national organization comprised of different local gangs. (DE# 24, p. 1).

In 1994, Smith murdered Folk Nation member, and fellow inmate, Dennis Cobb. (DE# 92-1, p. 38-39). Cobb had observed Smith fighting with another inmate and gave a statement to prison authorities. (DE# 92-1, p. 29-30). As a result, gang leaders concluded that Cobb must be punished with death. (DE# 92-1, p. 71). Because Smith was a gang "enforcer," he was responsible to carry out the punishment. (DE# 92-1, p. 71). Throughout the record, Cobb is described as a Folk Nation gang leader (DE# 24, p. 1), however, according to Smith's deposition testimony, Cobb was not a leader but a twenty-year-old member who was killed for turning his back on the Folk Nation brotherhood. (DE# 92-1, p. 15-16, 37-38). Smith was charged with second degree murder. He admitted to the crime and was sentenced to thirty years. (DE# 24, p. 2).

Five years later in the Dade Correctional Institution, two Folk Nation members stabbed Smith in retaliation for Cobb's murder. (DE# 92-1, p. 53-55).  As a result, Smith filed a federal civil rights action claiming the FDOC failed to protect him in violation of his Eighth Amendment rights.  <u>Smith v. Moore</u>, Case No. 00-4370-CIV-SEITZ.  The parties settled the matter, which included Smith's signing an Interstate Corrections Compact ("ICC") Waiver of Extradition (DE# 92-1, p. 151) agreeing to be sent to the State of Kansas.  Smith was transferred to the Kansas Department of Corrections ("KDOC") on June 5, 2002.  (DE# 24, p. 2).

According to Smith's complaint, "the [FDOC] sent information to the [KDOC] that he was sent there for protection, because he had killed the leader of Folk Nation and n[a]ture taking its course and the nation gang members wanted to now kill him."  (DE# 1, p. 3). In support of this position, Smith pointed to an a June 5, 2002 KDOC administrative segregation report which provides:

> Inmate Smith is being placed in administrative segregation on OSR (Other Security Risk) status upon his admission to the KDOC.  While incarcerated in Florida, he has been involved in numerous incidents of serious violent and disruptive behavior. . . . In 12/94, he murdered another inmate, for which he was criminally convicted of second degree murder and introduction of a weapon.  He self admitted the killing was gang related. He is a member of the UPG "Gay Lord Disciples" which aligned with the Folk Nation. . . .

(DE# 92-1, p. 154).

Smith's complaint alleged that the information improperly disclosed by the FDOC, and contained in the June 5, 2002 report, was leaked by KDOC officials to the inmate population. (DE# 1, p. 3).  Smith testified during his deposition that the report "was sent to about 20 different areas in the El Dorado Correctional Facility from dorms to segregation, copies of everything."[1]  (DE# 92-1, p. 77).

Smith was transferred from El Dorado to Hutchinson

---

[1] He noted that the report itself provides that a copy was distributed to "Records, the Secretary of Corrections, the Warden, DWO Suite, the Main Compound Entry, I&I, Inmates, Effective Administrative Lieutenant, Segregation Lieutenant, RDU Lieutenant, [and] the Effected Unit Team . . . E Dorm."  (DE# 92-1, p. 77).

Correctional Institution about a month after arriving in Kansas. (DE# 92-1, p. 9). In March of 2003, a Hutchinson inmate named Dirty Earl, who called the shots for Folk Nation, and several other Folk Nation members, confronted Smith in the gym. (DE# 92-1, p. 86). Earl told Smith "they were going to violate [Smith] . . .for covering [his gang] tattoos . . .that [Smith] was not allowed at any time to claim Folk . . . because they did not recognize [his] sect," namely, GLD, and that they wanted to punish Smith for a murdering a fellow gang member, Dennis Cobb. (DE# 92-1, p. 86, 93). Smith claimed that Earl learned about Smith's sect from the June 5, 2002 report. (DE# 92-1, p. 85). Prison guards on duty in the gym broke up the confrontation and returned Smith to his cell. (DE# 92-1, p. 89). The following day Smith was placed in protective custody. (DE# 92-1, p. 96). A week later, KDOC officials moved Smith to Lansing Correctional Facility. (DE# 92-1, p. 97). Less than a week after Smith arrived at Lansing, inmate Carlos Johnson, a member of the Kansas City Cripts (which falls under the authority of Folk Nation), learned about the 1994 murder and, with the help of a KDOC officer, raped Smith.[2] (DE# 92-1, p. 98-100). Smith began to file numerous grievances in Kansas and Florida, his family contacted corrections officials in Kansas and Florida, and he sought to be transferred back to Florida. (DE# 24, p. 3).

    In a December 10, 2008 Report (DE# 24), adopted by the District Court (DE# 36), the Undersigned recommended that Smith's "Complaint be construed to raise an Eighth Amendment claim pursuant to 42 U.S.C. §1983 and a pendent breach of contract claim and be

---

[2] The Undersigned explained in a December 10, 2008 Report that as a result of this incident,"Smith pursued a federal civil rights action in the District of Kansas, Smith v. Cummings, Case No. 03-3432-MLB, and the parties settled out of Court after the Tenth Circuit remanded the case, finding that Smith had properly raised claims under the Kansas Tort Claims Act under the district court's diversity jurisdiction, as he was a Florida domicile. The Tenth Circuit affirmed the award of a $6,000 default judgment against the officer who allegedly assisted a gang member to rape Smith and affirmed the summary judgment in favor of the other defendants, finding that the district court properly found that Smith had presented no evidence to show that Kansas officials were deliberately indifferent to his safety or that he was incarcerated under conditions posing a serious risk of harm. Smith v. Cummings, et al., 445 F.3d 1254 (10 Cir. 2006)." (DE# 24, p. 3).

permitted to proceed against the Secretary of the [FDOC], in his official capacity, for equitable relief." (DE# 24, p. 18). In construing Smith's complaint, the Undersigned explained that Smith argued that the FDOC violated his Eighth Amendment right to be free from cruel and unusual punishment in two ways. First, by an FDOC official's informing a KDOC official that Smith murdered a gang leader in Florida when the FDOC official knew or should have known that disclosing this information would, and did in fact, endanger Smith's life. Second, by failing to remove Smith from the custody of the KDOC after learning of the threat of imminent danger. (DE# 24, p. 9).

Smith filed a motion for summary judgment with respect to the §1983 claim and pendent breach of contract claim. (DE# 57). Smith asserted that when he was transferred to Kansas in June of 2002,

> [FDOC] Chief Interstate Compact, Mr. Robert M. Porter, failed to comply to procedures when Interstate Compacting an inmate to another state for his protection. Instead of sending the plaintiff's DOC files by Certified U.S. Postal Mail to Central Office of the [KDOC], they had given it to the Correctional Officers that transferred the plaintiff to El Dorado Correctional Facility in Kansas. Because of this error, the plaintiff reasons for his Interstate Compact was exposed to the entire facility. The plaintiff segregation report on June 5, 2002 . . . shows . . . the plaintiff's murder conviction and gang affiliation with Folk Nation. Furthermore, it had been provided to 20 different areas of the facility which includes the housing units. Because of the lack of security in insuring the plaintiff's reasons for Interstate Compact were not disclosed to anyone except for a need to know basis only, resulted in it leaking to the prison population.

(DE# 57, p. 3-4). Smith did not attach any exhibits and instead referred to the "near 200 exhibits" previously filed by him in this Court. (DE# 57, p.5). Subsequently, Smith filed a motion to supplement his motion for summary judgment with exhibits[3] (DE# 68),

---

[3] Smith attached the recitation of the facts contained in the order entered by the Kansas Federal District Court in Smith v. Cummings, Case No. 03-3432-MLB, which was reviewed on appeal in Smith v. Cummings, et al., 445 F.3d 1254 (10 Cir. 2006); a series of administrative segregation reports completed by KDOC officials in May of 2006, which resulted in Smith's being placed in protective custody; and several grievances filed by Smith in his ongoing effort to be returned to Florida. (DE# 68, p. 4-15).

4

which was granted (DE# 69).

Defendant FDOC filed a response to Smith's motion (DE# 58), with supporting exhibits (DE# 58-1), wherein it argued that summary judgment in Smith's favor is not appropriate because Smith failed to present any evidence that an FDOC official improperly disclosed Smith's gang status to the KDOC or that the KDOC leaked information regarding Smith's past to the inmate population. Attached to the response is an affidavit executed by Robert Porter, the FDOC's Bureau Chief of Interstate Compact in 2002, wherein he asserts that there is no policy requiring the FDOC to send the inmate's information by certified mail to the KDOC's central office and that, in Smith's case, the FDOC complied with ICC policies by sending the following to the Administrator of the ICC for the KDOC: the April 18, 2002 waiver of extradition, a certified copy of Smith's commitment papers, Smith's photograph, Smith's fingerprint card, and a medical discharge summary. (DE# 58-1, p. 1-2). In support of its argument that Smith, not the KDOC, leaked the information to other inmates, the FDOC attached a copy of a June 9, 2003 administrative segregation report[4] which states, "Inmate Smith has told others that he murdered the leader of the 'Folk Nation' gang in Florida on a contract hit." (DE# 58-1, p. 7). Smith subsequently filed a reply to the FDOC's response (DE# 62).

FDOC also filed a motion for summary judgment on the §1983 and pendent contract claims. (DE# 92). The FDOC supported the motion with a voluminous attachment (DE# 92-1) which includes a transcript of Smith's July 14, 2009 deposition (p. 3-150), the April 18, 2002 waiver of extradition (p. 151), Robert Porter's affidavit (p. 152-53), and the June 5, 2002 administration segregation report (p.

---

[4] When discussing this document in the body of the pleading, the FDOC states, "Plaintiff refers to a June 5, 2002 Administrative Segregation Report which outlines his past gang activity, including the murder, as proof that the information was leaked throughout the prison, however, the segregation report clearly states that it was the Plaintiff himself who had told others that he murdered the leader of the 'Folk Nation' gang in Florida on a contract hit. (See Exhibit 'B')." (DE# 58, p. 4). The document identified as "Exhibit B" is not the June 5, 2002 report, instead, Exhibit B is an administrative segregation report dated June 9, 2003.

154).[5]  Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), an order of instruction (DE# 93) was entered, informing Smith as a pro se litigant of his right to respond to the defendant's motion for summary  judgment. The order specifically instructed Smith regarding the requirements under Fed.R.Civ.P. 56 for a proper response to such a motion. (DE# 93). Smith filed a response (DE# 102) and four hundred plus pages of exhibits[6] in support thereof (DE# 102-1, 102-2, 102-3, 102-4, 103, 107). The FDOC subsequently filed a reply in support of its motion for summary judgment. (DE# 104).

On several occasions throughout these proceedings, Smith petitioned for injunctive relief.  Smith originally asked this Court to issue an order requiring the FDOC to return him to Florida and to void the April 2002 waiver of extradition (DE# 110) and subsequently sought an order directing that he be transferred from the KDOC to a Federal prison (DE# 56). The Undersigned recommended that both petitions be denied. (DE# 24, 59). The District Court adopted both recommendations. (DE# 36, 65).  In Smith's most recent petition for preliminary injunction (which is currently pending), he requests an order removing him from the KDOC's custody. (DE# 85). In support of his argument that he is not safe in Kansas, he explains that, on July 27, 2009, four inmates attacked him because of the 1994 gang-related murder and, as a result, he was seriously injured and had to be hospitalized. (DE#

---

[5]  The attachment also consists of Smith's FDOC inmate record as of March 10, 2009 (p. 1-2); an August 1, 2005 KDOC Warden Report to deputy secretary for inmates continuously held in administrative segregation for one year (p. 155); FDOC Security Threat Group Intelligence Unit employee Michelle Jordan's affidavit (p. 156-61); investigation report (with exhibits) in Smith v. Cummings, 03-3432-MLB (p. 162-217); FDOC Correctional Programs Administrator Cyndi Becker's affidavit (p. 218-19); KDOC's internal management policies and procedure (p. 220-231); KDOC investigator Mark Mora's affidavit (p. 232-37); and Mora's August 9, 2009 KDOC report on Smith's allegations of battery (p. 238-46).

[6]  Smith attached to the response itself a copy of his 1994 murder indictment and sentence (p. 49-55); the April 18, 2002 waiver of extradition (p. 57); the June 5, 2002 administrative segregation report (p. 63), Robert Porter's affidavit (p. 52-53); and the June 3, 2002 ICC transfer order (p. 68). The remaining exhibits consist primarily of grievances filed by Smith while incarcerated in Kansas, copies of documents Smith filed in Kansas and Florida Federal Court, and correspondence between Smith and various FDOC and KDOC officials involved with the ICC.

85). Smith did not expressly state where he wants to be placed, e.g., in Florida, in a Federal prison, or in another state.[7] The FDOC argues that Smith is not entitled to injunctive relief in its motion for summary judgment.[8] (DE# 92, p. 16).

## II. Analysis

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."

In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted)

Thus, pursuant to <u>Celotex</u> and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material

---

[7] The petition filed is missing the last page, therefore, the Undersigned cannot ascertain whether Smith discussed where he wants to serve the remainder of his sentence.

[8] Although the FDOC filed a motion for enlargement of time to respond to Smith's petition for injunctive relief (DE# 89), which this court granted (DE# 91), instead of filing a separate response, the FDOC included its response in its cross motion for summary judgment (DE# 92, p. 16).

7

fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the non-moving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the non-moving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson, 477 U.S. 242).

### B. Eighth Amendment Claim

It is well settled that the failure of prison officials to control or separate prisoners who endanger the physical safety of other prisoners may, under certain conditions, constitute an Eighth Amendment deprivation; however, the constitutional rights of inmates are not violated every time one inmate is injured as a result of another's actions. Smith v. Wade, 461 U.S. 30 (1983); Zatler v. Wainwright, 802 F.2d 397, 400 (11 Cir. 1986). The Constitution requires officials to take all reasonable precautions to protect inmates from known dangers. See Davidson v. Cannon, 474

U.S. 344 (1986); Wade, 461 U.S. 30; Zatler v. Wainwright, 802 F.2d 397; Harmon v. Berry, 728 F.2d 1407 (11 Cir. 1984). The known danger may arise either because there is a risk posed by one specific inmate against another, because there is a some other more general pervasive risk of harm because violence at the institution occurs with sufficient frequency that prisoners are put in reasonable fear for their safety and the problem and need for protective measures has been made known to prison officials.

For a prison or jail official to be constitutionally liable for failure to protect the safety of an inmate, two requirements must be met. First, the deprivation alleged must be, objectively, "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991); Hudson v. McMillian, 503 U.S. 1 (1992). Thus, for a claim based on an alleged failure to prevent harm, an inmate must show that he is incarcerated under conditions that pose a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 834 (1994). "[T]he protection [an inmate] is afforded against other inmates" is a "condition of confinement" subject to scrutiny under the Eighth Amendment. Wilson, 501 U.S. at 303. Second, the prison official who ignores a substantial risk of serious harm to an inmate must have a "sufficiently culpable state of mind," Farmer, 511 U.S. at 834. In cases predicated on prison conditions, that state of mind is one of "deliberate indifference" to the inmate's health or safety. Wilson, 501 U.S. at 302-03; Estelle v. Gamble, 429 U.S. 97, 106 (1976).

Traditionally, applicable authorities have described "deliberate indifference" as a state of mind more blameworthy than mere negligence or even gross negligence, Davidson, 474 U.S. 344; Estelle, 429 U.S. at 104; Parker v. Williams, 862 F.2d 1471 (11 Cir. 1989), and as something more than a lack of ordinary due care for a prisoner's safety. Whitley v. Albers, 475 U.S. 312 (1986).

Thus, in order to state a claim of cruel and unusual punishment, the courts have required that a prisoner must allege a conscious or callous indifference to his rights by prison officials. Davidson, 474 U.S. 344; Brown v. Hughes, 894 F.2d 1533, 1537-38 (11 Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11 Cir. 1988); Williams v. Bennett, 689 F.2d 1370, 1380 (11 Cir. 1982). Only such

9

a degree of disregard for the prisoner's rights, which offends evolving contemporary standards of decency and is repugnant to the conscience of mankind, separates official conduct that is actionable under Section 1983 from simple negligence which is not. When the plaintiff fails to allege and show proof of such an abuse, what may be an ordinary tort does not rise to the level of a constitutional violation actionable under Section 1983. Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Estelle, 429 U.S. at 106; Byrd v. Clark, 783 F.2d 1002, 1006 (11 Cir. 1986); Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11 Cir. 1985); Williams, 689 F.2d at 1380.

The Supreme Court has emphasized that Eighth Amendment liability requires a showing that the responsible official was subjectively conscious of risk to the inmate:

> We hold . . . that a prison official cannot be liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837; see also, LaMarca v. Turner, 995 F.2d 1535, 1536 (11 Cir. 1993).

Thus there must be an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation. See Zatler, 802 F.2d at 401. See also LaMarca v. Turner, supra, 995 F.2d at 1536. "Personal participation . . . is only one of several ways to establish the requisite causal connection," Zatler, 802 F.2d at 401, and thus, personal participation is not the sine qua non for the defendants to be found personally liable. Swint v. City of Wadley, Ala., 5 F.3d 1435, 1446 (11 Cir. 1993), opinion modified on other grounds, 11 F.3d 1030 (11 Cir. 1994). The defendant prison official must, however, ignore a substantial risk of serious harm to the inmate. Wilson, 501 U.S. 294; Estelle, 429 U.S. 97.

This case is analogous to cases alleging that a correctional official made statements intending to incite inmates to attack another inmate, which may state a claim under the Eighth Amendment.

See, e.g., Harmon, 728 F.2d 1407; Northington v. Jackson, 973 F.2d 1518, 1525 (10 Cir. 1992) (an allegation that an officer intended to harm an inmate by inciting inmates to beat him may constitute an excessive force claim; if an inmate is able to prove such intent, "it is as if the guard himself inflicted the beating as punishment"); Valandingham v. Bojorquez, 866 F.2d 1135, 1139 (9 Cir. 1989) (defendant officers calling plaintiff a "snitch" in the presence of other inmates is material to a §1983 claim for denial of right not to be subjected to physical harm).

The Eighth Amendment also protects against future harm to prison inmates. Helling v. McKinney, 509 U.S. 25, 33-34 (1993). An inmate may be granted injunctive or declaratory relief even in the absence of proof that he actually has been injured by the dangerous condition. See id.; see also Nichols v. Riley, 141 Fed.Appx. 868, 869, 2005 WL 1715751, 1 (11 Cir. 2005). An Eighth Amendment claim may proceed against the sending state defendants in their official capacities for injunctive relief. See, e.g., Trujillo v. Williams, 465 F.3d 1210, 1224 (10 Cir. 2006).

In this case, Smith's complaint alleged that the FDOC violated his Eighth Amendment right to be free from cruel and unusual punishment (1) by disclosing information to the KDOC regarding Smith's past involvement in gang activities and (2) by refusing to transfer Smith out of Kansas and back to Florida upon learning that Smith had been attacked repeatedly and was continuously in danger of future attack by Folk Nation members. (DE# 24, p. 9).

### Point 1: FDOC's Disclosure of Smith's Past to KDOC

In developing the first claim, Smith argues that when he was originally placed in the KDOC's custody, the FDOC, through its employee Robert Porter, informed KDOC intake officers that Smith murdered a Folk Nation gang leader, when the ICC policies and procedure prohibited this disclosure. A KDOC official relayed this information in a June 2, 2005 administration segregation report and widely distributed the report, which was then leaked by unknown prison officers to the general inmate population. As a result, Smith was attacked by Folk Nation members on several occasions. (DE# 57, p. 3-5; 102, p. 8-12). The FDOC counters that neither

Porter nor any other FDOC official disclosed information about Smith in violation of the ICC policies, that the KDOC was entitled to information regarding Smith's past, and that the FDOC is not responsible for a subsequent leak which might have occurred from a KDOC officer to the inmate population. (DE# 35, 92, 104).

With the exception of a single reference to Robert Porter in his motion for summary judgment, Smith does not provide any evidence, e.g., deposition testimony, affidavits, of the identity of the FDOC official who leaked information to KDOC officials. During Smith's July 14, 2009 deposition, the FDOC's counsel asked Smith the following question about the original leak.

> Q.   Is there a piece of paper, anything that says that Florida sent information up to Kansas that said you killed the leader of the Folk Nation.
> A.   I know this, I was standing there when the officers brought me in to RDU with my files, this stack, and handed it to the officer in RDU.  Them files should have never been handed to any officer in RDU.  They should have been in central records because I am under interstate compact and my location and reasons for interstate compact were not supposed to be disclosed to anyone except on a need to know basis.

(DE# 92-1, p.123-24).

Smith also failed to present evidence that disclosing his gang past to KDOC officials violated ICC policies. Robert Porter, the FDOC's ICC Bureau Chief in 2002, executed an affidavit wherein he described the procedure involved when negotiating with another state regarding the transfer of an inmate. Porter's affidavit provides in relevant part:

> 4.   If the [FDOC] were in contact with another state regarding its ability to house one of the [FDOC]'s inmates, contact would be made with the Administrator, or designee, for that state's Interstate Corrections Compact.
> 5.   Information regarding the inmate's presentence investigation, photograph, classification and admission summary, current progress report, commitment papers, DC12 screen, medical information, and gang information, would be sent to the Administrator for review.
> 6.   In interstate transfers, it is imperative to give all information regarding the inmate so that a proper assessment can be made regarding the inmate's ability to be housed in the other state. . . .

During his deposition, Smith was given an opportunity to rebut Porter's testimony. Specifically, FDOC's counsel asked why he believed ICC policies prohibited Florida from informing KDOC officials about Smith's past.

> Q. And so what we're trying to get at is what information was leaked, what you think was leaked, what you think shouldn't have been leaked. Now, are you in agreement that Kansas City had a right before accepting you to understand your incarceration history?
> A. Yes, Central Office. Not the officer on duty that's accepting me through the prison.
> Q. So you don't think your classification has anything to do when they handle an inmate here in the prison.
> A. When you're dealing with interstate compact on protective issues, right, it is strict protocol down here when it comes to that . . . .
>     . . .
> Q. I'm still trying to get at from the complaint where we're talking about what information Florida gave, who they gave it to and what right they have. Now you say it's strict protocol. Tell me the protocol, the rule and the policy.
> A. I don't' know.
> Q. Where does it come from? Is it a statute or is it a policy of DOC, is it a policy of Kansas? Where is the policy?
> A. I don't know. . . . Even if it was not a written policy, wouldn't it seem like the most logical thing to do. If you're dealing – if you're sending a guy out on witness protection program, you're not going to tell everybody why he's going and what he's going there for. As soon as his protection is compromised, you're going to move him. Releasing that kind of information into a prison administration like that, you're taking the chance of it going down the grapevine and the prison grapevine has a way of turning it inside out by the time it gets to population.

(DE# 92-1, p. 125-26).

Even Assuming Florida officials disclosed information to KDOC officials in violation of ICC procedure, Smith has not presented evidence that a KDOC official leaked the information to the inmate population at large. During his deposition, Smith repeatedly claimed that the information contained in the June 5, 2005 report was widely distributed to prison officers who passed the information on to the general inmate population through the "prison grapevine." (DE# 92-1, p. 78-81). The FDOC pointed to evidence which suggests that Smith was responsible for the original leak.

13

Smith admitted that he covered some of his gang tattoos, other inmates knew he covered his tattoos, and some tattoos identifying Smith as a GLD member remained visible. (DE# 92-1, p. 68). The FDOC attached to its motion for summary judgment a June 9, 2003 administration segregation report which states, "Inmate Smith has told others that he murdered the leader of the 'Folk Nation' gang in Florida on a contract hit." (DE# 92-1, p. 155).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In this case, Smith has not presented sufficient evidence (1) that a specific FDOC official improperly disclosed information to the KDOC regarding Smith's past gang activities (2) that the ICC policies prohibited the FDOC from disclosing said information and/or (3) that a KDOC official, and not Smith, was responsible for passing the information on to the inmate population. Without evidence of these facts, Smith cannot establish an element essential to his case, namely, a causal connection between the defendant's acts and Smith's alleged constitutional deprivation. See Zatler, 802 F.2d at 401.

### Point 2: FDOC's Failure to Remove Smith From Kansas

Smith next argues that the FDOC violated his Eighth Amendment rights by failing to remove him from the Kansas prison system where he was repeatedly attacked and at constant risk of future attack. Smith argues that the FDOC is "directly responsible for violation of [Smith's] Eighth Amendment right, by failing to investigate and/or take corrective action," i.e., returning him to Florida, "when [the FDOC] was made aware" that Smith was attacked and that "his life was in danger in the [KDOC] by the prison gangs of Folk Nation." (DE# 102, p. 39-40). Smith concludes that the FDOC's failure to act constituted deliberate indifference. (DE# 102, p. 14). See Farmer.

In support of his argument, Smith presented evidence of three attacks against Smith in retaliation for the 1994 gang-related

murder. On March 26, 2003, inmate Dirty Earl, and several other inmates, attempted to attack him in the prison gym. Smith filed a copy of a March 26, 2003 administrative segregation report which provides that immediately after the incident, Smith informed guards that he believed his life was in danger, the guards placed Smith in segregation, an investigation was conducted, officials recommended Smith should be placed in protective custody, and Smith was in protective custody until April 1, 2003 at which point he moved to Lansing Correctional Facility. (DE# 102, p. 12). Smith testified to the foregoing during his deposition.

While housed in Lansing, Smith reported that inmate Carlos Johnson sexually assaulted him on several occasions with the help of a prison officer. Smith requested, and received, protective custody on May 7, 2003. Smith remained in protective custody while officials investigated his claim. (DE# 102, p. 13). Smith submitted grievances to the FDOC and the KDOC regarding the sexual assault, wherein Smith explained that his life was in danger and requested to move back to Florida. (DE# 102, p. 13). The KDOC conducted an investigation and decided to place Smith in segregation at El Dorado. (DE# 102, p. 14). The FDOC responded to Smith's grievance with a letter explaining that the FDOC had contacted the KDOC regarding the incident and was told that the KDOC had the situation under control and did not request to return Smith to Florida. (DE# 102, p. 14).

From 2003 through 2009, Smith did not report any attacks. Smith spent much of this time in segregation. (DE# 102, p. 16). On July 27, 2009, Smith was severely battered by several other inmates. KDOC investigator Mark Mora conducted an investigation and concluded that "there was no indication in the course of this investigation that this incident had a connection or relevance to Inmate Smith being housed as an interstate compact inmate." (DE# 92-1, p. 235).

The above evidence on which Smith relies actually detracts from his claim. It reveals that the KDOC took steps to protect Smith each time he believed he was at risk and investigated each of Smith's claims. These steps were successful in that, from 2003 until 2009, Smith did not report any altercations with Folk Nation

members.  In addition, Smith provides evidence that FDOC acted each time it received a grievance from Smith by contacting the KDOC and informing Smith of its actions in a subsequent written response. Smith's evidence does not establish that KDOC or FDOC officials were deliberately indifferent to his safety and, in fact, shows just the opposite.  Thus, Smith again fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), namely, that the defendant was deliberately indifferent to Smith's health or safety. See Estelle v. Gamble, 429 U.S. 97, 106 (1976).

In light of the foregoing, summary judgment in the FDOC's favor is appropriate with respect to Smith's §1983 claim.

### C.  Pendent Contract Claim

Because this Court did not retain jurisdiction over enforcement of the settlement agreement, this Court lacks the authority to adjudicate motions to enforce the settlement agreement filed in the 2000 civil rights case.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994) (The enforcement of a settlement agreement "is more than just a continuation or renewal of the dismissed suit," a claim regarding breach of such an agreement "requires its own basis for jurisdiction.").  Furthermore, Smith cannot proceed on a separate claim that there has been a violation of the Interstate Corrections Compact, because such violations are not violations of federal law. See Smith v. Cummings, et al., 445 F.3d 1254, 1259 (10 Cir. 2006).

Although this Court does not have jurisdiction to entertain a breach of contract claim by itself, such claim may be considered as a pendent claim.  A claim for breach of contract, is not a constitutional matter, but a state claim, which the Court would have the power to resolve as a pendent state issue only if the court already has jurisdiction over the parties.  In other words, the parties must either be diverse or there must be a substantial federal claim asserted against the defendant. Williams v. Bennett,

16

689 F.2d 1370, 1379-80 (11 Cir. 1982), cert. denied, 464 U.S. 932 (1983). Pendent jurisdiction, however, is a doctrine of discretion, 21stnot of plaintiff's right, and generally, if all federal claims are eliminated before trial, the plaintiff's pendent state claims will be dismissed and he is required to return to the state forum to pursue them. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Brown v. Masonry Products, Inc., 874 F.2d 1476 (11 Cir. 1989), cert. denied, 493 U.S. 1087 (1990); Fiscus v. City of Roswell, 832 F. Supp. 1558, 1564-65 (N.D.Ga. 1993).

In this case, having concluded that summary judgment in the FDOC's favor is appropriate on all federal claims, Smith's pendent state claim must be dismissed.

### D. Petition for Preliminary Injunction

District courts may grant preliminary injunctive relief if the movant shows the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the damage the injunction would cause the non-movant; and (4) the injunction would not be adverse to the public interest. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11 Cir. 2003); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11 Cir. 1996). The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the movant must show actual success on the merits instead of a likelihood of success on the merits. Siegel v. Lepore, 234 F.3d 1163, 1213 (11 Cir. 2000). The movant must demonstrate irreparable injury and the absence of an adequate remedy at law. Id.

In this case, the Undersigned concluded above that no aspect of Smith's claims can go forward and that summary judgment in the FDOC's favor is appropriate. It follows that Smith cannot show a substantial likelihood of success on the merits. This Court need not consider the remaining three prongs because the failure to establish a single element results in a denial of the petition for

injunctive relief.

### III.  Conclusion

It is therefore recommended as follows:

1.   Defendant FDOC's Motion for Summary Judgment (DE# 92) be granted as to Eighth Amendment claim pursuant to 42 U.S.C. §1983 and the pendent contract claim.

2.  Plaintiff Smith's motion for summary judgment (DE# 57) be denied.

3.  Plaintiff Smith's petition for preliminary injunction (DE# 85) be denied.

4.  Plaintiff Smith's motion for leave to file excess pages (DE# 101) and motion to supplement exhibits (DE# 107)be granted, as the Undersigned considered these pages and exhibits in this Report.

5.   Plaintiff Smith's motion requesting a hearing and oral argument on the motions for summary judgment (DE# 106) be denied.

6.  The case be closed.

7. All other pending motions not otherwise ruled upon by separate order be dismissed as moot.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

It is so recommended at Miami, Florida, this 21st Day of December, 2009.

_____
UNITED STATES MAGISTRATE JUDGE


cc:

Todd Carlton Smith
No. 74848
El Dorado Correctional Facility
P. O. Box 311
El Dorado, KS 67042

```
Kathleen Mary Savor
Office of the Attorney General
110 SE 6 Street
10th Floor
Fort Lauderdale, FL 33301
```